IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| IDA PETTUS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No. 4:11CV00046 SWW |
| | * | |
| ELBERT HARVEY and LAURA BEDNAR, | * | |
| in their individual capacities, | * | |
| | * | |
| Defendants. | * | |

| | | |
|---|---|---|
| IDA M. PETTUS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No. 4:11CV00424 SWW |
| | * | |
| ARKANSAS DEPARTMENT OF | * | |
| EDUCATION, | * | |
| | * | |
| Defendant. | * | |

**Memorandum Opinion and Order**

Before the Court is defendants' motion for summary judgment to which plaintiff responded. Defendants filed a reply to the response. For the reasons stated below, the Court finds the motion for summary judgment should be granted.

**Background[1]**

Plaintiff Ida Pettus ("Pettus"), a black female, began working for defendant Arkansas Department of Education ("ADE") first in 1998 and then again in 1999. When she applied to the

---

[1] These background facts are taken mainly from defendants' statement of undisputed facts which plaintiff did not controvert. *See* docket entries 26 & 32.

ADE in 1999, Pettus said she would be willing to accept employment anywhere in the state. Pettus was employed as a School Improvement Advisor ("SIA") when she was terminated from her job on January 14, 2011.

Defendant Elbert Harvey, a white male, became Pettus's direct supervisor in February 2010, and in April 2010, defendant Laura Bednar became Harvey's direct supervisor. Defendant Bednar, an ADE Assistant Commissioner, oversees the Division of Learning Services, which has fourteen different units, including the School Improvement Unit, which is managed by Harvey, the Coordinator of the Statewide System of Support. Generally speaking, the School Improvement Unit assists school districts in developing and implementing their annual school improvement plans or Arkansas Comprehensive School Improvement Plans ("ACSIP"). After these plans are approved, the ADE interacts with the districts as they amend, adjust, and implement their plans, and then resubmit them for final approval.

There is also a "Smart Accountability" process that allows the state to better differentiate interventions and resources to schools most in need. Under Smart Accountability, a State Specialty Team ("SST"), composed of ADE, educational cooperative, and other personnel meets with and assists school districts in identifying and addressing areas in which the district is having problems. Under Smart Accountability, the SST's are scheduled to meet quarterly with district leadership to review progress and develop the steps to be taken before the next scheduled meeting. Between the scheduled district meetings, various other meetings are held between SST members as well as SST members and district leadership. When Harvey began managing ADE's School Improvement Unit, he changed how school districts were served under Smart Accountability, instituting a much more active leadership role for the SIAs. While SIAs

previously were merely SST members, they now would lead the team.

Generally, an educational cooperative provides services to school districts within the co-op region with the overall goal of increasing student achievement. Each co-op is governed by a board composed of the superintendent of each school district in the co-op region. In the summer of 2010, Harvey reorganized the statewide service areas to generally focus them around the educational co-ops, and then reassigned SIAs to service these geographic areas. At the time of the reorganization, Pettus already had been working directly with some of the school districts (as their ACSIP supervisor) also served by the Dawson Co-Op, so Harvey assigned her to work with that co-op.

On May 20, 2010, Harvey sent an e-mail to all SIAs cancelling all "field work" until further notice and directing the SIAs to be at their official work station[2] during their scheduled work hours. The following morning, Pettus was not at work and Harvey could not find her. He tried to reach her on her ADE cell phone but she did not answer and he left a message for Pettus to call him back. When he did not hear back for over an hour, he contacted the Bryant School District where, according to Pettus's Outlook calendar, she was scheduled to be that morning. Bryant School District informed Harvey she was not there and Pettus had changed the meeting date. Pettus arrived at work at 11:30 a.m. at which time she told Harvey she had been at a scheduled doctor's appointment. On May 26, 2010, Harvey issued Pettus a letter of reprimand, noting that she failed to file for leave prior to taking it in violation of ADE policy. The letter warned her that "[a]ny recurrence of this infraction or other act of misconduct may lead to future disciplinary action up to and including an immediate recommendation for your termination."

---

[2]Pettus's official work station at that time was Little Rock.

Previously, on May 21, 2010, Harvey had issued Pettus a "letter of clarification" but determined that it should be converted to a letter of reprimand due to the nature of her offense.

On September 2, 2010, Harvey issued a letter of reprimand to Pettus for failing to attend SST training at the Dawson Co-Op on August 24, 2010. The training was conducted via Compressed Interactive Video ("CIV"), which provided two-way video and audio communication between all participants. The SST members, including the SIAs, participated in the CIV from the various educational co-op sites from around the state. Every SIA except Pettus attended this training. In his letter, Harvey noted that the CIV training had been discussed at numerous other trainings and staff meetings since April, with a final schedule issued on August 9. Harvey also noted in the reprimand letter that in checking Pettus's Outlook calendar he noticed the calendar was not completed as directed.

Regarding the calendar issue, when Harvey became manager of the School Improvement Unit, he notified the SIAs that their Outlook calendars must be updated to indicate the SIA's planned schedule for the next two weeks. He discussed this two-week calendaring requirement with Pettus during his September 2 meeting with her and also presented her with a second copy of notes from a staff meeting on July 8, which Pettus did not attend because she was on vacation, during which he discussed the calendaring requirement. According to Fred Hodge, an Administrative Specialist, there is no reason why any SIA would not be aware of the requirement.

Defendant Harvey said that during this same period of time, Dawson Co-Op personnel told him that they lacked confidence in Pettus's abilities and leadership, and asked that ADE provide another SIA to work with them instead of Pettus. Ms. Beth Neel, Dawon's Teacher

Center Coordinator said she voiced concerns about Pettus to Becky Jester, Dawson Co-Op's Director, and to Harvey, and asked whether the ADE could replace Pettus with another SIA. Harvey notified co-op personnel that such a request would need to be put in writing. Harvey said that in addition to the complaints from Dawson Co-Op, he had personally observed what he considered to be lack of leadership skills by Pettus. He said he discussed with Pettus the concerns brought to him by the Dawson Co-Op and told Pettus that if the Co-Op put them in writing, he would have to address them. Harvey said there was one other time that a co-op requested that he not assign a SIA and that was when the Western Co-Op asked that he not assign a particular white male and he did not assign him there. Mr. Hodge said that he was aware of incidents where school districts, when calling the School Improvement Unit and learning that Pettus was their assigned SIA, asked to speak to someone else.

    On September 8, 2010, Harvey received a letter from Jester requesting that someone other than Pettus be assigned to work with schools within the Dawson Co-Op. On the same day, Harvey gave Pettus a copy of the letter and notified her that she would be housed at ADE in Little Rock pending a new assignment. Harvey said he did not feel that the request was racially motivated but that it was based on Pettus's leadership abilities. In addition, Harvey noted that the Dawson Co-Op had several black employees, including Jester's "second in command."

    Harvey said that at this point in time, all service areas had been assigned SIAs other than Pettus. The only exception was that one of the two SIAs assigned to Crowley's Ridge Co-Op in Harrisburg, Arkansas, had left to take a job with the Little Rock School District. So Harvey assigned Pettus to Crowley's Ridge Co-Op, which became Pettus's official work station on September 21, 2010.

Because the Dawson Co-Op was within 60 miles of Little Rock, Pettus's official work station was considered Little Rock, and the ADE paid her mileage when she went to the Dawson Co-Op. Because Crowley's Ridge Co-Op was farther than 60 miles from Little Rock, it became Pettus's official work station and she was not paid mileage for traveling there from Little Rock. Crowley's Ridge Co-Op, in Harrisburg, Arkansas, was also the official work station of the other SIA, Pam Clark, a white female, and she was not reimbursed for mileage for traveling from her home in Newport, Arkansas, to the Co-Op.

Prior to being officially assigned to Crowley's Ridge Co-Op, Pettus spent some time there working along side Clark. During this period, there also was a three-day conference in Hot Springs, Arkansas that Pettus and the other SIAs attended. After Pettus told Clark that she had been officially assigned to Crowley's Ridge, Clark said she told Pettus they needed to divide up the schools Clark had been handling. Ms. Clark said Pettus refused, saying she did not want any of the schools. Clark said she dropped the issue for the time being until Harvey specifically instructed Clark to give Pettus some of the schools. Clark said it was protocol at Crowley's Ridge Co-Op that the SIAs worked as a team and split up the workload among themselves, although sometimes the ADE in Little Rock would make the assignments.

On September 16, 2010, the Equal Employment Opportunity Commission ("EEOC") mailed the ADE a notification that Pettus had filed a charge of discrimination and retaliation. The charge related to the two letters of reprimand that Pettus had received from Harvey. The EEOC did not request a response from the ADE, and on September 22, 2010, the EEOC issued Pettus a right-to-sue letter. Harvey said he did not learn of the charge that was the subject of the September 16 letter until mid-October, at which time the ADE's Human Resources Department

notified him that the EEOC was seeking a response to another EEOC charge Pettus had filed.

Starting September 23, 2010, Pettus was off work for about three weeks; part of the time she was off under the Family and Medical Leave Act ("FMLA") to care for her daughter. According to Harvey, Pettus was upset that she was not receiving mileage reimbursement for her travel to Crowley's Ridge Co-Op and she was not willing to reside in the Harrisburg area. Harvey agreed to allow Pettus to work out of the ADE offices in Little Rock two days per week to limit her travel days which she did upon return from her FMLA leave. When SIA Mary Calloway resigned her position in late October 2010, Harvey assigned the North Little Rock and Pulaski County School Districts to Pettus, both of which she could work out of the ADE Little Rock office. On October 18, 2010, Harvey gave Pettus an overall rating of "satisfactory" on her performance evaluation.

On October 19, 2010, the EEOC mailed the ADE a notification that Pettus had filed another charge of discrimination and retaliation over the two reprimand letters and her assignment to Crowley's Ridge Co-Op. The EEOC issued a right-to-sue letter on February 22, 2011. Pettus also filed a complaint with the United States Department of Education alleging race discrimination and retaliation which the Department referred to the EEOC.

Pettus also filed a complaint through the ADE's internal grievance procedure on November 24, 2010, alleging race discrimination and harassment. Specifically, Pettus complained about being unfairly reprimanded, not being given work assignments "for two months," being assigned to Crowley's Ridge Co-Op without receiving travel reimbursement, and receiving an unsatisfactory job evaluation. Pettus's grievance was denied at the agency level. The State Employee Grievance Appeal Panel ("SEGAP") found in Pettus's favor on a portion of

her grievance, and the ADE appealed. On October 21, 2011, the SEGAP decision was reversed.

The ADE held an internal hearing on Pettus's grievance on December 10, 2010. Before the hearing began, Harvey instructed Pettus to submit any request she had for annual leave during the holiday season and asked her to update her calendar for the rest of the year. Pettus said at the hearing that she interpreted Harvey's remarks to mean that she had to take time off during the holidays. During the hearing, Harvey clarified that Pettus did not have to take time off and could work through the holidays if she wanted. Later that day, Harvey checked the SIAs' calendars to see if they had been updated; Pettus's had not.

On the morning of December 13, 2010, Pettus fell and injured her knee while working at the Little Rock office. She left the office around 1:00 p.m. to go to the doctor and then took sick leave for the rest of the week. While off work, Pettus filed another grievance on December 16, 2010, complaining that Harvey attempted to "undermine [her] leadership" by interrupting her while she was conducting a meeting with SST members. Pettus worked off and on from December 20, 2010, until her termination on January 14, 2011.

On December 17, 2010, Harvey checked the SIAs' Outlook calenders for holiday coverage. Although Pettus had been working through December 10 and then for several hours on the day of her injury, Harvey said her Outlook calendar still had not been properly updated. Harvey checked Pettus's calendar again on January 3, 2011, and then on January 7. Although Pettus had filled in her December calendar, her January calendar still was not properly updated on either the 3rd or the 7th. On January 7, 2011, Harvey printed Pettus's December and January calendar pages.

Defendant Harvey consulted with Assistant Commissioner of Human Resources Beverly

Williams on January 12, 2011, about Pettus's repeated failure to update her calendar in accordance with his instructions. Ms. Williams instructed Harvey to check Pettus's calendar again, which he did on January 12, and it contained the same entries as it had on January 7. On January 12, Harvey also discussed the situation with Bednar who confirmed that Harvey had discussed the matter with Human Resources to ensure that they had not missed anything or that they needed to do something different. On that same day, Harvey decided that termination was appropriate because of Pettus's repeated failure to update her calendar as directed.

On January 13, 2011, Pettus submitted to ADE Human Services a FMLA Certification which said she was unable to perform any duties from 12/13/10 through 12/20/10 and only partial duties from 12/21/10 through 12/29/10. The Certification also noted that Pettus might need intermittent leave from 12/29/30 through 1/12/11 approximately twice per week, two to three hours per day, for physical therapy if approved by Worker's Compensation.

On January 14, 2011, Harvey and Bednar met with Pettus to discuss her termination. Harvey gave her a termination letter and supporting documentation. Pettus testified that on January 14, 2011, her Outlook calendar was in fact updated; that she had printed a copy of the January 2011 page that was updated through the end of the month before the meeting; and that Harvey and Bednar refused to allow her to go back to her office to get a copy. Defendants deny they refused Pettus permission to ger her calendar, and Pettus testified that she went back to her office after the termination meeting but made no attempt to give Harvey, Bednar, or any other official a copy of her calendar showing that she had updated it.

In an EEOC Intake Questionnaire dated February 28, 2011, Pettus wrote that she had updated her calendar and that someone had deleted the information. When asked about the allegation during

her deposition, Pettus said Hodge, who was helping her with her calendar, could have accidently deleted the calendar information. Based on her belief that Harvey discriminated and retaliated against her, Pettus also said Harvey may have deleted the information. Harvey said he could not have deleted information from Pettus's calendar because he only had access to review and not edit her calendar. On April 12, 2011, Pettus filed a charge of discrimination with the EEOC alleging her termination was based on race and in retaliation for having filed previous EEOC complaints. The EEOC issued a right-to-sue letter on April 19, 2011.

 On January 18, 2011, Pettus filed a law suit against the State of Arkansas, ADE Director Thomas Kimbrell, in his official capacity, and Harvey and Bednar in their individual capacities alleging race discrimination and retaliation under 42 U.S.C. §§ 1981 and 1983 and violation of the Family and Medical Leave Act and the Arkansas Civil Rights Act (Case No. 4:11cv46 SWW). On May 4, 2011, the Court dismissed Pettus's § 1981 and Arkansas Civil Rights Act claims, her § 1983 claims against the State of Arkansas and Kimbrell, and her FMLA claim against the State of Arkansas. On May 18, 2011, Pettus filed a Title VII employment discrimination complaint against the ADE (Case No. 4:11cv424 SWW). The cases were consolidated on June 27, 2011.

Defendants argue they are entitled to summary judgment because Pettus cannot establish a *prima facie* case of discrimination or retaliation or that the reasons defendants gave for their actions were a pretext for illegal discrimination. Defendants Harvey and Bednar also argue they are entitled to qualified immunity.

### Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The non-moving party may not rest on mere allegations or denials of her pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587 (citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### Discussion

Pettus brings her race discrimination and retaliation claims pursuant to 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964.[3] In the absence of direct evidence, a plaintiff asserting a

---

[3]The Eighth Circuit analyzes Title VII and § 1983 claims under the same framework. *Humphries v. Pulaski County Special Sch. Dist.*, 580 F.3d 688, 692 n.3 (8th Cir. 2009).

11

claim of discrimination under Title VII has the initial burden of establishing a *prima facie* case. A plaintiff establishes a *prima facie* case by showing that: (1) she was a member of a protected class; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) she has facts that give rise to an inference of discrimination. *Takele v. Mayo Clinic,* 576 F.3d 834, 838 (8th Cir. 2009). A plaintiff may establish the fourth prong by producing facts that similarly situated employees outside the protected class were treated differently. *Id.*

If the plaintiff establishes the elements of a *prima facie* case, then the employer has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas Corp.,* 411 U.S. 792, 802 (1973). Once the employer satisfies its burden of production, any rebuttable presumption of discrimination disappears, and the plaintiff must prove that the proffered reasons are a pretext for discrimination. *Id.* The burden of proof remains at all times with the plaintiff to establish that she was the victim of unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993).

Pettus claims she was terminated because of her race and in retaliation for filing charges of discrimination, and for using leave under the FMLA. She also complains that her job location was changed from Little Rock to Harrisburg in retaliation for complaining about race discrimination and that Harvey made her working conditions intolerable by transferring her from the Dawson Co-Op to Crowley's Ridge Co-Op, not giving her any duties to perform during certain periods of time, asking her to write a perception of her job duties, and repeatedly interrupting her during a meeting.

1. Termination

Defendants argue Pettus failed to meet her *prima facie* burden because the ADE "had the

legitimate expectation that [Pettus] would not be insubordinate in the performance of [her] duties," *Miner v. Bi-State Dev. Agency*, 943 F.2d 912, 913-14 (8th Cir. 1992), and she failed to offer evidence of any other SIA who failed to update his or her calendar as often as she yet suffered lesser consequences. Further, defendants argue Pettus failed to establish that the legitimate, non-discriminatory reason given by her employer for her termination was pretextual.

There is no dispute that Harvey required all SIAs to keep their calendars updated two weeks in advance. While Pettus testified she believes such a requirement is unreasonable because SIAs' schedules change so much, that is not her decision. In *Tolerson v. Auburn Steel Co.*, 987 F. Supp. 700, 710 (E.D.Ark.), *aff'd*, 131 F.3d 1255 (8th Cir. 1997), *cert. denied*, 523 U.S. 1095 (1998) (internal quotation and citation omitted), the court recognized that "[a]n employer has the right to . . . assign work, to change an employee's duties, to refuse to assign a particular job, and to discharge - for good reason, bad reason, or no reason at all, absent . . . intentional discrimination." *See also Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 n.3 (8th Cir. 1985)(an employer may develop arbitrary, ridiculous and even irrational policies as long as they are applied in a nondiscriminatory manner). Pettus submits no evidence that the policy regarding updated calendars was applied in a discriminatory manner.

After her termination, Pettus presented a Outlook calendar page purportedly dated January 3, 2011, in which she had listed an activity on every work day in January. It is uncontested, however, that Harvey printed her January calendar on January 7, 2011, and on that date Pettus's calendar was not properly updated. Harvey testified that when he checked Pettus's calendar again on January 12, 2011, it had the same entries as on January 7. Even assuming *arguendo* that some unidentified person who had edit access to Pettus's calendar accidentally or intentionally deleted

several of her calendar entries, that would not change the fact that the calendar was not properly updated when Harvey reviewed the calendar on January 7 and again on January 12. The critical inquiry is whether Harvey had a good faith belief that Pettus violated the calendaring rule. *See McCullough v. Univ. of Ark. for Med. Sci.*, 559 F.3d 855, 862 (8th Cir. 2009). Although Pettus testified she had a hard copy of her January calendar page which she said was printed on January 3 showing that she had fully updated her calendar, she did not show it to Harvey, Bednar, or anyone else at ADE on her date of termination.

Pettus also claims her termination was in retaliation for filing complaints alleging discrimination. First Amendment retaliation claims are analyzed under the same framework as claims of retaliation under Title VII. *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 878 (8th Cir. 2005). Plaintiff Pettus must establish that she engaged in protected conduct, was subjected to an adverse employment action, and there is a causal connection between the protected conduct and the adverse action. *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 985 (8th Cir. 2011).

> In terms of the causal connection, the plaintiff must show that the protected conduct was a "determinative—not merely motivating—factor in the employer's adverse employment decision. If the plaintiff succeeds, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. If the defendant does so, the plaintiff can still prevail on a final step of the *McDonnell Douglas* analysis by proving, by a preponderance of the evidence, that the reasons proffered by the employer are merely pretext for discrimination.

*Id.* at 985-86 (internal quotations and citations omitted).

Pettus filed an EEOC charge in September 2010 complaining about the two letters of reprimands she received. She filed another charge of discrimination with the EEOC in October 2010. It was after Pettus filed the second EEOC charge that Harvey became aware of the earlier

one. Defendant Harvey terminated Pettus in January 2011. Generally, "more than a temporal connection is required to present a genuine factual issue on retaliation," and only in cases where the proximity is very close may the plaintiff rest on it exclusively. *Tyler, supra*, 628 F.3d at 980, 986. Over two months passed between Pettus filing her EEOC charges and making a complaint to the U.S. Department of Education and her termination. An "interval as brief as two months [does] not show causation for purposes of establishing a retaliation claim." *Id.*

Pettus has presented no evidence establishing a causal connection between her protected conduct and her termination. In addition, she has failed to offer evidence sufficient to establish a legitimate issue of material fact as to whether the legitimate, non-retaliatory reasons set forth by her employer for its actions were pretextual.

Pettus also alleges her termination was in retaliation for taking FMLA leave. Such a claim is evaluated under the *McDonnell Douglas* framework. *Phillips v. Mathews*, 547 F.3d 905 (8th Cir. 2008). Pettus was taking FMLA leave at the time of her termination, but there is no evidence that the two were causally linked. The evidence is clear that Harvey, who made the decision to terminate Pettus, was concerned with her failure to properly update her calendar well before Pettus began taking FMLA leave due to her knee injury. The record is clear that Pettus had been afforded FMLA previously to care for her daughter, and in addition to approving FMLA leave, Harvey further accommodated her knee injury by allowing Pettus to work out of the Little Rock office and not requiring her to travel to Crowley's Ride Co-Op while she was recuperating. When asked whether she thought Harvey was retaliating against her for taking FMLA leave, Pettus said she thought he was retaliating against her for filing complaints with the EEOC and contacting the U.S. Department of Education.

Because Pettus failed to meet her *prima facie* burden, her FMLA retaliation claim must fail. Additionally, for the same reasons set out above, Pettus failed to provide evidence to create a genuine issue of material fact as to whether the proffered reason for her termination was pretextual.

2. Transfer to Crowley's Ridge Co-Op

Pettus argues that her removal from Dawson Co-Op and subsequent reassignment to Crowley's Ridge Co-Op was illegal race discrimination and in retaliation for complaining about race discrimination. She complains that because of her reassignment, her work station changed so that she would not be reimbursed for mileage. She claims she was treated differently than white employees as far as the distance she had to travel. Defendants assert Pettus cannot establish a *prima facie* case because the reassignment was not an adverse employment action, and Pettus has no evidence that a similarly situated white employee was treated more favorably. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not." *Sallis v. Univ. of Minnesota*, 408 F.3d 470, 476 (8th Cir. 2005)(citations omitted). "A transfer involving only minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action, '[o]therwise every trivial personnel action that an irritable ... employee did not like would form the basis of a discrimination suit.'" *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997)(citing *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)). The Court finds Pettus fails to establish that she suffered an adverse employment action or that there were non-African American employees who

were allowed to determine where they would be stationed when there was only one open area in the state.[4]

Pettus complains that Crowley's Ridge Co-Op is the only co-op in the state with two full-time SIAs and that her duties at Crowley's Ridge Co-Op are the same ones she had at Dawson Co-Op which Harvey said she was incapable of doing. Even if Pettus could establish a *prima facie* case, the Court finds she has not shown that the justification for her reassignment is a pretext. The evidence is undisputed that the director of the Dawson Co-Op asked Harvey to assign a different SIA to that co-op because she was concerned about Pettus's leadership abilities. The evidence is also undisputed that Harvey honored the request of a different co-op not to assign a white male to serve it. The evidence is also uncontested that the only service area that had a vacancy at the time of Pettus's reassignment was Crowley's Ridge.

Pettus has the burden to produce evidence sufficient to create a genuine issue of material fact regarding whether Harvey's proffered explanation is merely a pretext for unlawful discrimination and retaliation. Unsubstantiated and conclusory allegations are insufficient to support an inference of pretext. *Rose-Matson v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998). Pettus has produced no factual evidence supporting her claim that Harvey's decision to transfer her to Crowley's Ridge was based on race or retaliation. As stated above, Harvey did not know until mid-October 2010 that Pettus had filed two EEOC complaints; he reassigned Pettus to Crowley's Ridge Co-Op in September 2010.

---

[4] The Court also finds Pettus has not established a *prima face* case of discrimination regarding her complaints that Harvey did not assign her any duties for certain periods of time, that he asked to her write her perception of her job duties, and interrupted her during a meeting. These allegations do not establish an adverse employment action. *See Sallis, supra.*

**Conclusion**

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [docket entry 24] be and is hereby granted. Judgment will be entered for defendants.

DATED this 13th day of April, 2012.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE